United States District Court
Southern District of Texas
**ENTERED**
September 03, 2019
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JASMA McCULLOUGH,                   §
                                    §
        Plaintiff,                  §
                                    §
v.                                  §        Civil Action No. H-17-83
                                    §
SHAYOLONDA HERRON,                  §
                                    §
        Defendant.                  §

## <u>MEMORANDUM AND RECOMMENDATION</u>

Pending before the court[1] is Defendant Shayolonda Herron's
Motion for Summary Judgment (Doc. 107), Plaintiff's Motion In
Limine to Exclude Undisclosed Exhibits G, H and I of Defendant's
Motion for Summary Judgment (Doc. 108), and Plaintiff's Response in
Opposition to Defendant's Motion for Summary Judgment (Doc. 115).
Having considered the motions and the responses thereto,
Plaintiff's Motion In Limine is **GRANTED**, and it is **RECOMMENDED** that
Defendant's Motion for Summary Judgment be **GRANTED**.

## I.  Case Background

Plaintiff filed this action against state and county child
protection officials for alleged constitutional violations
resulting from the forcible removal of her children from her
custody in 2015.

---

[1]      This case was referred to the undersigned magistrate judge pursuant
to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the
Civil Justice Reform Act, and Federal Rule of Civil Procedure 72.  <u>See</u> Doc. 5,
Ord. Dated Jan. 12, 2017.

A.   __Factual Background__

Plaintiff alleged that, in November 2014, Texas Department of Family Protective Services ("TDFPS") employee Shayolonda Herron ("Herron") received referrals alleging medical neglect and neglectful supervision by Plaintiff concerning two of her three children.[2]   In her live complaint, Plaintiff denied that the children had been medically neglected and complained that Herron failed to properly investigate the allegations.[3]   When Herron demanded that Plaintiff take a drug test, Plaintiff alleged, she protested but eventually complied.[4]

On January 5, 2015, Herron appeared before a judge of the 311th Judicial District Court of Harris County, Texas, and swore to the contents of two affidavits supporting her request for an emergency removal of Plaintiff's three children from Plaintiff's custody.[5] Herron orally explained to the judge that Plaintiff had failed to take one child with a history of seizures to the doctor and that Plaintiff had tested positive for cocaine use on December 29, 2014.[6]   The court then considered the affidavits.[7]

---

[2]    See Doc. 78, Pl.'s 8th Am. Compl. p. 20.

[3]    See id. p. 2.

[4]    See id. p. 21.

[5]    See Doc. 107-6, Ex. F to Def.'s Mot. for Summ. J., Tr. of Hr'g.

[6]    See id. p. 6.

[7]    See id. p. 9.

2

The first affidavit concerned KNM, described as a four-year-old boy with a reported medical history of a seizure disorder.[8] The second affidavit concerned KRM, a three-year old, and KS, an eleven-month old.[9]  The affidavits are otherwise identical and will be referred to as one document.

Herron's affidavit averred that TDFPS had received an intake report of medical neglect concerning KNM on November 22, 2014.[10] In the report, the child's paternal grandmother stated that she was the child's primary caregiver and complained that she had learned two weeks earlier that KNM had a seizure disorder after he had two seizures in one day and required a hospital visit.[11] According to the grandmother, the hospital recommended that KNM needed a follow-up visit with a neurologist.[12]  The grandmother also reported that Plaintiff had not taken any of her children for medical or dental checkups and had not had the children vaccinated.[13]  The grandmother stated that Plaintiff was "very unstable," and was often evicted

---

[8]    See Doc. 107-1, Ex. A to Def.'s Mot. for Summ. J., Aff. of Herron p. 3.

[9]    See Doc. 107-2, Ex. B to Def.'s Mot. for Summ. J, Aff. of Herron.

[10]   See Doc. 107-1, Ex. A to Def.'s Mot. for Summ. J., Aff. of Herron p. 3. The report is found at Doc. 107-3, Ex. C to Def.'s Mot. for Summ. J., Investigation Report p. 1.

[11]   See Doc. 107-1, Ex. A to Def.'s Mot. for Summ. J., Aff. of Herron p. 3.

[12]   See id.

[13]   See id.

from apartments.[14]

Herron's affidavit recounted that five days later TDFPS received a second intake referral alleging neglectful supervision of KS, the eleven-month-old, half-sibling of KNM.[15] That report stated that Plaintiff's brother took Plaintiff to the residence of KS's father because Plaintiff wanted to borrow the father's truck.[16] When KS's father refused, he and Plaintiff engaged in a verbal altercation, followed by a physical altercation between Plaintiff's brother and KS's father.[17]  Plaintiff got into the truck and drove away with KS on her lap.[18]  The father chased the truck, and Plaintiff surrendered the truck to the father three-quarters of a mile away.[19]  The report related that KS's father then returned to the apartment complex and drove his truck into the vehicle belonging to Plaintiff's brother.[20]  No one was injured; KS's father was arrested.[21]

Herron's affidavit explained that, after receiving the first referral, she had attempted to locate Plaintiff but was unable to

---

[14]    See id.

[15]    See id.

[16]    See id.

[17]    See id.

[18]    See id.

[19]    See id.

[20]    See id.

[21]    See id. pp. 3-4.

do so because the address on the intake form was incorrect.[22]  After the second referral, a new address was obtained.[23]  Herron stated that she was unsuccessful at contacting Plaintiff a second time and left her card at Plaintiff's residence.[24]  Herron also attempted to contact KNM's father, Nathaniel McCoy ("McCoy").[25]

On December 1, 2014, McCoy returned Herron's call and told her that he wanted custody of his two children with Plaintiff because she was not taking care of them.[26]  He recounted that KNM had seizures and that Plaintiff refused to take the child to a neurologist.[27]  McCoy also complained that the children's clothing was always dirty and that Plaintiff never took the children to get their hair cut.[28]  He also related that Plaintiff moved frequently and had posted pornographic videos of herself on Facebook.[29]

According to Herron's affidavit, on December 4, 2014, Plaintiff returned Herron's call and stated that she would come to Herron's office with KS in order to resolve the investigation.[30]

---

[22]     See id. p. 4.

[23]     See id.

[24]     See id.

[25]     See id.

[26]     See id. p. 5.

[27]     See id.

[28]     See id.

[29]     See id.

[30]     See id.

However, Plaintiff did not appear as promised.[31]  On December 8, 2014, Herron followed up with Plaintiff.[32]  Plaintiff agreed to meet Herron on December 9, 2014, at Plaintiff's residence.[33]

On December 9, 2014, Herron met with Plaintiff, who was living in an empty apartment that had been leased by her sister who had moved out.[34]  The only furnishing observed was a small Christmas tree.[35]  Plaintiff stated that they slept on air mattresses.[36]

According to Herron's affidavit, Plaintiff admitted that she had a domestic dispute with KS's father and that she drove away in the vehicle with KS on her lap.[37]  Plaintiff told Herron that Plaintiff did not think there was anything wrong with holding KS on her lap while driving.[38]  Plaintiff admitted that the children did not have a primary care physician and explained that, if the children got sick, she took them to the emergency room.[39]

Plaintiff also admitted that KNM had a seizure recently

---

[31]    See id.

[32]    See id.

[33]    See id.

[34]    See id.

[35]    See id.

[36]    See id.

[37]    See id.

[38]    See id. p. 6.

[39]    See id.

because he had a fever of 102.1 degrees.[40] After administering Tylenol and Motrin, the child was fine.[41]  Herron reported that Plaintiff signed a safety plan and agreed to take all three children to the doctor.[42]

The affidavit recounted that, on December 10, 2014, Plaintiff called Herron to reschedule the children's doctor's appointment because Plaintiff's mother was unable to provide transportation.[43] Herron told her that rescheduling was unacceptable; nonetheless, Plaintiff rescheduled the appointment online for December 12, 2014.[44]

Herron further averred that on December 13, 2014, she informed Plaintiff that Plaintiff must take a drug test.[45]  When Plaintiff offered excuses for not being able to comply with this request, such as she did not have identification or transportation, Herron told Plaintiff that she would meet Plaintiff at the testing facility to verify her identity.[46]  Plaintiff never arrived.[47]

On December 14, 2014, Herron again attempted to obtain

---

[40]    See id.

[41]    See id.

[42]    See id.

[43]    See id.

[44]    See id.

[45]    See id.

[46]    See id.

[47]    See id.

compliance with her request that Plaintiff submit to drug testing.[48]
At first, Plaintiff stated that she did not have transportation;
when Herron offered her a ride, Plaintiff stated she had a ride and
was on her way.[49]  Plaintiff did not get a drug test that day, later
telling Herron that Plaintiff did not know that the lab closed at
5:00 p.m.[50]

On December 18, 2014, Herron gave Plaintiff an ultimatum,
either submit to drug testing and take the children to the doctor
or Herron would pursue legal action against her.[51]  Plaintiff
submitted to a drug test that day and made a doctor's appointment
for the children on December 22, 2014.[52]  On December 23, 2014,
Plaintiff told Herron that she was not able take the children to
the doctor because they were not signed up for Medicaid.[53]  When
Herron suggested that Plaintiff apply for Medicaid benefits,
Plaintiff asked for Herron's supervisor's name and number.[54]

According to the affidavit, on December 29, 2014, Plaintiff
informed Herron that the clinic would not see the children without

---

[48]    See id.

[49]    See id.

[50]    See id.

[51]    See id.

[52]    See id.

[53]    See id.

[54]    See id.

their shot records.[55]  Herron offered to look up the shot records for the children online; Plaintiff advised that the doctor's office was about to remove her from the clinic because she was being rude and disrespectful.[56]

The affidavit also stated that on January 4, 2015, a check of the Texas Alcohol and Drug Testing website showed that Plaintiff's drug test was positive for cocaine.[57]  The affidavit did not include the additional information that the positive drug screen was based on a hair sample and that a blood test from the same day returned a negative result.[58]  As of January 5, 2015, Plaintiff had not taken the children to the doctor.[59]

Herron's affidavit recounted that Plaintiff and McCoy had a prior incident involving Child Protective Services in 2012.[60]  Then it was reported that a child was in the custody of his father when he fell off a milk crate and injured his head.[61]  McCoy refused emergency medical treatment and fled with the boy, throwing him over a fence in order to evade emergency medical personnel and law

---

[55]    See id. p. 7.

[56]    See id.

[57]    See id.

[58]    See Doc. 107-5, Drug Test Results, pp. 2-5.

[59]    See Doc. 107-1, Ex. A to Def.'s Mot. for Summ. J., Aff. of Herron p. 7.

[60]    See id.

[61]    See id.

enforcement.[62]   Herron's affidavit stated that Plaintiff was aware of McCoy's drug usage but still allowed the child to reside with McCoy.[63]   The family was referred for additional services at that time.[64]

Herron's affidavit reported that Plaintiff had no criminal record but that McCoy had been convicted of aggravated assault on a family member in April 2012 and was sentenced to two years confinement.[65]   Herron also stated in her affidavit that Plaintiff refused to give the caseworker information about other relatives as alternative custodians for the children because her family did not want to be involved with Child Protective Services.[66]

Herron's affidavit concluded:

All reasonable efforts have been made to work with Ms. McCullough to ensure the children's medical needs are met.   However, due to the ongoing untreated seizure activity from 4yo K[NM], the mother's constant misleading the agency of making the children medical appointments, failure to provide medical insurance, constant delay in following directives given to her by TDFPS for the safety and wellbeing of her children to get the children medical checkups, placing 11 month old K[S] in a dangerous situation by holding him in her lap while operating a motor vehicle and engaging in a domestic violence dispute with the father, . . . , and testing positive for cocaine.   Therefore, the [TDFPS] are requesting to be name[d] Emergency Managing Conservator [of the three

---

[62]   See id.

[63]   See id.

[64]   See id.

[65]   See id.

[66]   See id.

children].

The court reviewed the affidavits and signed the emergency order of removal.[67]  A follow-up hearing was set for January 14, 2015, at 8:00 a.m.[68]

On January 14, 2015, a hearing was held on the emergency removal of the children.[69]  Herron, Plaintiff, McCoy, McCoy's mother, KS's father and the children's attorney ad litem were all present.[70]  Herron testified about Plaintiff's refusal to comply with Herron's requests for medical checkups for the children and Plaintiff's failed drug test.[71]  Herron recounted giving Plaintiff numerous opportunities to comply with Herron's requests and Plaintiff's excuses for not doing so.[72]

Herron testified that KNM had been placed with his paternal grandmother and was now current with his medical and dental checkups and his vaccinations.[73]  She stated that her current concerns about returning KNM to Plaintiff's custody were Plaintiff's positive drug test, Plaintiff's lack of any residence,

---

[67]   See id. p. 9.

[68]   See id.

[69]   See Doc. 107-7, Ex. G to Def.'s Mot. for Summ. J., Hr'g Tr. Dated Jan. 14, 2015, Hr'g Regarding KNM.

[70]   See id. p. 2.

[71]   See id. p. 8.

[72]   See id. p. 10.

[73]   See id.

and the ongoing conflict between Plaintiff and McCoy.[74]   Herron testified that she had asked McCoy to take a drug test but, as of the hearing, he had not done so.[75]

At the hearing, Plaintiff denied taking illegal drugs and denied that KNM had a seizure disorder.[76]   She admitted that the children's shots were not current.[77]   Plaintiff also admitted that she had made and canceled several doctor's appointments for the children leading up to the emergency removal of the children from her custody.[78]   Plaintiff admitted that her brother and KS's father had a dispute over the vehicle but denied that KS was not in a car seat when she drove off in the vehicle.[79]   She admitted driving the vehicle three-quarters of a mile with KS's father hanging onto the outside of the vehicle but denied knowing that he was there because the car stereo was loud.[80]   KS's father testified that during the incident when he was hanging off the outside of the vehicle, he observed that KS was standing in the back seat of the vehicle and

---

[74]      See id. pp. 11-12.

[75]      See id. p. 13.  Later in the hearing, McCoy admitted that he was on felony parole for assaulting Plaintiff.  See id. p. 29.  McCoy denied smoking marijuana and stated that he expected to pass a drug test if required.  See id. pp. 28-29.

[76]      See id. p. 15.

[77]      See id. p. 16.

[78]      See id. pp. 17-19.

[79]      See id. p. 19.

[80]      See id.  pp. 20-21.

not strapped into his car seat.[81]

At the conclusion of the hearing, the court appointed TDFPS as the temporary managing conservator and approved the placement of the children with KNM's paternal grandmother.[82]  McCoy was ordered to take an instant drug test, and Plaintiff and McCoy were only allowed to have supervised visits with the children at the CPS office.[83]

On February 18, 2015, a status report was filed with the court outlining the progress each parent had made with respect to regaining custody of the children.[84]

## B.  **Case Background**

On January 6, 2017, Plaintiff filed this action against the TDFPS, Shayolonda Herron, Sonya White, Deidra Ford, Herbert Canada and Fredrick Jones.[85]  On February 8, 2017, the individual defendants filed a motion seeking an order compelling a Rule 7(a) reply from Plaintiff on the ground that, as employees of TDFPS,

---

[81]    See Doc. 107-8, Ex. H to Def.'s Mot. for Summ. J., Hr'g Transcript Dated Jan. 14, 2015, Hr'g Regarding KRM & KS pp. 23-24, 26. The father stated, "I was running 40 miles [per hour] holding [on]to the truck.  I couldn't see where KS was.  As I got onto the truck, KS was standing up in the back seat.  He wasn't in his car seat, he wasn't strapped in, he wasn't in her lap.  This whole report is wrong." Id. p. 23.

[82]    See Doc. 107-7, Ex. G to Def.'s Mot. for Summ. J., Hr'g Tr. Dated Jan. 14, 2015, Hr'g Regarding KNM p. 31; Doc. 107-8, Ex. H to Def.'s Mot. for Summ. J., Hr'g Tr. Dated Jan. 14, 2015, Hr'g Regarding KRM & KS p. 31.

[83]    See Doc. 107-7, Ex. G to Def.'s Mot. for Summ. J., Hr'g Tr. Dated Jan. 14, 2015, Hr'g Regarding KNM pp. 32-33.

[84]    See Doc. 107-9, Status Report to the Ct. Regarding KNM.

[85]    See Doc. 1, Pl.'s Orig. Compl.

they were entitled to invoke affirmative defenses of Eleventh
Amendment immunity, qualified immunity, and official immunity.[86]
On February 14, 2017, Plaintiff filed an amended complaint, adding
claims against Kristina Day and Jennifer Lombardi.[87]

On March 20, 2017, Plaintiff filed another amended complaint,
this time dropping Kristina Day and Jennifer Lombardi as
defendants.[88]  On March 30, 2017, Plaintiff filed a third amended
complaint, again complaining that the defendants violated her Fifth
and Fourteenth Amendments rights to due process and her Fourth
Amendment right to be secure in her residence when her children
were removed without a search warrant.[89]

On April 6, 2017, Defendants moved to dismiss Plaintiff's
complaint.[90]  In the motion, the individual defendants asserted that
Plaintiff lacked standing to bring claims against TDFPS, that her
claims against several defendants were not factually supported,
that Plaintiff's state law claims were barred as a matter of law
and that the Rooker-Feldman doctrine barred Plaintiff from
attacking a state court judgment.

---

[86]   See Doc. 12, Defs.' Mot. for Rule 7(a) Reply, pp. 2-4.  At a hearing
held on March 24, 2017, the court denied the motion and ordered Defendants to
file a motion to dismiss by April 6, 2017.  See Doc. 24, Min. Entry Ord. Dated
Mar. 24, 2017.

[87]   See Doc. 13, Pl.'s 1st Am. Compl.

[88]   See Doc. 23, Pl.'s 2nd Am. Compl.

[89]   See Doc. 25, Pl.'s 3rd Am. Compl. pp. 3-4.

[90]   See Doc. 44, Defs.' Mot. to Dismiss.

14

Plaintiff filed amended complaints on April 13, 2017, and April 27, 2017, adding Harris County Protective Services to the caption, dropping TDFPS from the caption, and specifying that the individuals were sued in their individual, not official, capacities.[91]

On May 31, 2017, the court recommended dismissal of Plaintiff's claims against the individual defendants and Harris County Protective Services based on the Rooker-Feldman doctrine.[92]

On June 14, 2017, Plaintiff filed a motion for leave to file a sixth amended complaint.[93]  In this complaint, she purported to represent the interests of her minor children.[94]  Leave was granted, but Plaintiff missed the deadline to file the amended complaint.[95] Plaintiff's seventh amended complaint was filed on June 26, 2017.[96]

On July 21, 2017, the court adopted the Memorandum and Recommendation and dismissed the action.[97]  On July 24, 2017, Plaintiff filed a motion to correct errors, essentially seeking

---

[91]    See Doc. 30, Pl.'s 5th Am. Compl. p. 1.

[92]    See Doc. 47, Mem. & Rec. pp. 10-11.  The court also denied Plaintiff's motion to prevent the Texas Attorney General from representing either TDFPS or its employees.  See id. p. 12.

[93]    See Doc. 49, Pl.'s Mot. for Leave to Amend.

[94]    See id. p. 1.

[95]    See Doc. 50, Ord. Dated. June 15, 2017; Doc. 51, Am. Mot. for Leave to Amend; Doc. 56, Am. Mot. for Leave to Amend.

[96]    See Doc. 57, Pl.'s 7th Am. Compl.

[97]    See Doc. 62, Ord. Adopting Mem. & Rec.; Doc. 63, Final J.

reconsideration of the court's order of dismissal.[98]

On December 6, 2017, the court reconsidered its dismissal, reinstated the action on its docket and deemed the Seventh Amended Complaint to be the live pleading.[99]  On January 25, 2018, Plaintiff was granted leave to file her Eighth Amended Complaint.[100]  In the complaint, Plaintiff complained that four TDFPS employees and Harris County violated her constitutional rights when they obtained an emergency removal order based on false information.[101]

On June 7, 2018, the court recommended dismissal of Plaintiff's claims against Harris County and the individual defendants for violations of Plaintiff's procedural due process rights.[102]  The court recommended a partial denial of Herron's motion to dismiss Plaintiff's right to family integrity claim based on qualified immunity, finding that Herron was not entitled to qualified immunity based on Plaintiff's allegation that Herron lied in her affidavit to obtain the court order for the removal of the children.[103]  That recommendation was adopted on July 11, 2018.[104]

Defendant Herron timely filed the pending motion for summary

---

[98]    See Doc. 66, Pl.' Mot. to Correct Errors.

[99]    See Doc. 71, Ord. Dated Dec. 6, 2017.

[100]   See Doc. 77, Ord. Dated Jan. 25, 2018.

[101]   See Doc. 78, Pl.'s 8th Am. Compl. pp. 3-5.

[102]   See Doc. 90, Mem. & Rec. Dated June 7, 2018 pp. 22, 25.

[103]   See id. p. 21.

[104]   See Doc. 92, Ord. Dated July 11, 2018.

judgment on February 19, 2019.[105]   In response, Plaintiff filed a
motion in limine and a response to the motion.[106]

## II.   Plaintiff's Motion In Limine

Here, Plaintiff objects to the court's consideration of
Exhibits G, H, and I of Defendant's Motion for Summary Judgment.
Those exhibits are the two post-removal hearing transcripts from
January 14, 2015 (Exs. G, H) and the Status Report to the court
dated February 18, 2015 (Ex. I).   Plaintiff argues that these
documents were not provided to her in discovery and therefore they
should be excluded from the court's consideration pursuant to
Federal Rule of Civil Procedure ("Rule") 37(c)(1).

It is unclear if Plaintiff propounded any written discovery in
this action, and Plaintiff took no action to compel pretrial
production of any document.  However, Rule 26(a)(1)(a)(ii) requires
the voluntary production of "all documents . . . that the
disclosing party has it its possession, custody, or control and may
use to support its claims or defenses . . . ."  The court agrees
that these documents should have been produced voluntarily to
Plaintiff during the discovery period, which expired on January 31,
2019.  The documents are **EXCLUDED** and will not be considered by the

---

[105]     See Doc. 107, Def.'s Mot. for Summ. J.

[106]     See Doc. 108, Pl.'s Mot. In Limine; Doc. 115, Pl.'s Resp. to Def.'s
Mot. for Summ. J.  Plaintiff has filed other motions that are not relevant to the
motions presently before the court and will not be recounted herein.

court in its analysis.[107]

### III.   Summary Judgment Standard

Summary judgment is warranted when the evidence reveals that no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Stauffer v. Gearhart, 741 F.3d 574, 581 (5th Cir. 2014). A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit. Anderson v. Liberty Lobby,Inc., 477 U.S. 242, 248 (1986); Ameristar Jet Charter, Inc. v. Signal Composites, Inc., 271 F.3d 624, 626 (5th Cir. 2001). To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of either party. See Royal v. CCC & R Tres Arboles, L.L.C., 736 F.3d 396, 400 (5th Cir. 2013)(quoting Anderson, 477 U.S. at 248).

The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues. Celotex Corp., 477 U.S. at 323; Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th

---

[107]   Plaintiff's Response to Defendant's Motion for Summary Judgment appears to refer to portions of these transcripts, but it is unclear because the pagination does not match the actual transcripts attached to Herron's motion. Because the court grants Plaintiff's motion, it will not consider what may be transcript excerpts retyped by Plaintiff in her response.

Cir. 1992).  If the movant carries its burden, the nonmovant may not rest on the allegations or denials in the pleading but must respond with evidence showing a genuine factual dispute.  <u>Stauffer</u>, 741 F.3d at 581 (citing <u>Hathaway v. Bazany</u>, 507 F.3d 312, 319 (5ᵗʰ Cir. 2007)).

## IV.  Analysis

Presently before the court is Herron's motion for summary judgment challenging whether Plaintiff can overcome Herron's assertion of qualified immunity for statements made in her affidavit.  Plaintiff has not submitted any authenticated summary judgment evidence in response to Herron's motion.

## A.  <u>Qualified Immunity</u>

Government officials are entitled to qualified immunity from liability for civil damages "unless [(1)] the official violated a statutory or constitutional right [(2)] that was clearly established at the time of the challenged conduct." <u>Reichle v. Howards</u>, 566 U.S. 658, 664 (2012).  Qualified immunity protects an officer even for reasonable mistakes in judgment. <u>See</u> <u>Ashcroft v. Al-Kidd</u>, 563 U.S. 731, 743 (2011)("Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions."); <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009)("The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of

law and fact.'")(quoting <u>Groh v. Ramirez</u>, 540 U.S. 551, 567 (2004)(dissenting opinion)).  By invoking qualified immunity, a defendant shifts the burden to the plaintiff to rebut the defendant's assertion.  <u>Cantrell v. City of Murphy</u>, 666 F.3d 911, 918 (5th Cir. 2012).

## B.  <u>Substantive Due Process - Right to Family Integrity</u>

In the court's prior memorandum, the court found that the United States Supreme Court has referred to the "interest of parents in the care, custody, and control of their children" as "perhaps the oldest of the fundamental liberty interests recognized by this Court."[108]  <u>Troxel v. Granville</u>, 530 U.S. 57, 65 (2000). Among other protections, this constitutional right protects family unity from interference by "the awesome power of the state." <u>Hodorowski v. Ray</u>, 844 F.2d 1210, 1216 (5th Cir. 1988)(quoting <u>Duchesne v. Sugarman</u>, 566 F.2d 817, 825 (2[d] Cir. 1977)).  The right is not without limits as it is tempered by "the state's interest in protecting the health, safety, and welfare of children." <u>Wooley v. City of Baton Rouge</u>, 211 F.3d 913, 924 (5th Cir. 2000).

In <u>Marks v. Hudson</u>, ___ F.3d ___, 2019 WL 3727817, at *1 (5th Cir. Aug. 8, 2019), the court considered whether the mother of three minor children could overcome a claim of qualified immunity by state social workers based on the mother's allegation that the social workers performed a deficient investigation into allegations

---

[108]     <u>See</u> Doc. 90, Mem. & Rec. p. 16.

of child abuse and made false statements in affidavits to obtain a temporary order of removal of the children from her home.

In considering whether the law was clearly established at the time of the challenged investigation and allegedly false affidavits, the court reviewed its prior decisions involving claimed deprivations of familial rights. The court found that it was clearly established in <u>Wernecke v. Garcia</u>, 591 F.3d 386, 399-400 (5th Cir. 2009), that the Fourth Amendment governed a social worker's investigation of child abuse allegations and that <u>Stewart v. Perry</u>, 369 F. App'x 593, 594 (5th Cir. 2010)(unpublished) clearly established that due process of law must be afforded to parents before a child could be removed, permanently or temporarily, from the home, absent exigent circumstances. <u>See</u> <u>Marks</u>, 2019 WL 3727817, at *3.

The <u>Marks</u> court also acknowledged that a panel of the court found in an unpublished opinion that it was clearly established that a social worker could violate the Fourth Amendment by making a false statement or material omission "knowingly and intentionally, or with reckless disregard for the truth" that resulted in the issuance of a court order for a child's removal from the custody of his parent. <u>Marks</u>, 2019 WL 3727817 at *1 (quoting <u>Wernecke v. Garcia</u>, 452 F. App'x 479, 481 (5th Cir. 2011)(unpublished)(citations omitted).

The <u>Marks</u> court concluded that, even though the unpublished

21

Wernecke decision was non-precedential, its citations to other precedential case authority clearly established that a Fourth Amendment violation exists for a false affidavit submitted to a court for the purpose of obtaining a child seizure order.  See Marks, 2019 WL 3727817, at *3.  The court turned to the evidentiary standard to be employed when a social worker is applying for a temporary order of conservatorship, a temporary restraining order or an order of attachment authorizing the governmental entity to take possession of a child.  See Marks, 2019 WL 3727817 at *4.  The court determined that the standard to be employed was probable cause.  See id.

The applicable statute, Section 262.102(a) of the Texas Family Code, permits a governmental entity to take possession of a child if:

> (1) there is an immediate danger to the physical health or safety of the child . . . and that continuation in the home would be contrary to the child's welfare;

> (2) there is no time, consistent with the physical health or safety of the child . . . for a full adversary hearing . . .; and

> (3) reasonable efforts, consistent with the circumstances and providing for the safety of the child were made to prevent or eliminate the need for the removal of the child.

The court then considered whether the allegations in the submitted affidavits would have supported probable cause.  See id.  In doing so, the court confined its review to consider whether, after removing the plausibly claimed fabrications, and inserting all

22

plausibly claimed omissions, the affidavit would still support the court's finding of probable cause.  <u>See</u> <u>id.</u>  After reviewing the alleged fabrications and alleged omissions, the court found that there was still probable cause to believe that the child was in danger.  <u>Id.</u> at *5.

## C.   <u>**Herron's Affidavit**</u>

Having outlined the clearly established law, the court turns to whether the evidence creates a fact issue that Herron violated Plaintiff's constitutional rights by lying in her affidavit.

### 1.   **Drug Usage.**

The undisputed summary judgment evidence supports Herron's statement that Plaintiff tested positive for cocaine usage.[109] Herron was entitled to rely on a written lab report that showed a positive result for cocaine when a hair sample was tested.  The fact that a contemporaneous blood test was negative for cocaine or that Plaintiff disagrees with the hair sample result does not raise a constitutional claim that Herron lied in her affidavit.

Even if the court were to consider whether this omitted fact of the negative blood test would have been material in the court's finding of probable cause, the probable cause determination would not change.  The negative blood test would only raise an inference that the cocaine usage was not recent but would not cast doubt on the other facts outlined in Herron's affidavit that supported the

---

[109]    <u>See</u> Doc. 107-5, Ex. E to Def.'s Mot. for Summ. J., Drug Report p. 1.

removal of the children based on medical neglect and negligent supervision.

### 2.   Seizure Disorder/Medical Neglect

Herron's affidavit stated that on November 22, 2014, TDFPS received an intake referral from the children's paternal grandmother reporting that one of Plaintiff's children had a seizure disorder and that he and the other children were being medically neglected.[110]   The summary judgment record included this intake referral in which the grandmother reported that she was the primary caregiver for the child and his siblings.[111]   The grandmother related that the four-year-old had a seizure disorder of which Plaintiff was aware, that a hospital recommended follow-up care with a neurologist, that Plaintiff had not made an appointment with a neurologist and that Plaintiff had neglected to take all three children for medical and dental appointments including vaccinations.[112]   The grandmother further informed TDFPS that Plaintiff was "very unstable" and "often gets evicted."[113]

Herron followed up on this report by contacting the grandmother and attempting to contact Plaintiff and McCoy, the

---

[110]   See Doc. 107-1, Ex. A to Def.'s Mot. for Summ. J., Aff. of Herron p. 3.

[111]   See Doc. 107-3, Ex. C to Def.'s Mot. for Summ. J., Investigative Report p. 2.

[112]   See id.

[113]   Id.

child's father.[114]  On November 25, 2015, Herron went to Plaintiff's residence but no one answered the door.[115]  On December 2, 2014, Herron again attempted contact with Plaintiff, but was unsuccessful.[116]

On December 1, 2014, Herron received a call from McCoy who confirmed his mother's report that Plaintiff was not taking care of the children, that she had refused to take them to the doctor, that his son KNM had a seizure disorder and that McCoy wanted custody of his children.[117]

On December 9, 2014, Herron visited Plaintiff at her residence.[118]  Herron recorded that Plaintiff and the children were living in an empty apartment vacated by Plaintiff's sister.[119]  The apartment had no furniture; Plaintiff explained that they slept on air mattresses.[120]  Herron's report also stated that Plaintiff told Herron that the children did not have a primary care physician and that when the children were ill, she took them to the emergency

---

[114]    See id. p. 16.

[115]    See id. p. 17.

[116]    See id. p. 18.  Herron noted that after the November 27, 2014 incident, she obtained another address for Plaintiff from the police report.  See id. p. 19.

[117]    See id. p. 19.

[118]    See id. p. 20.

[119]    See id.

[120]    See id.

room.[121]   At the interview, Plaintiff admitted that KNM had a seizure two weeks earlier but that the seizures occurred only when he had a fever.[122]  Plaintiff agreed to take all the children to the doctor.[123]   Herron's report set out the dates on which Plaintiff stated that she intended to take the children to the doctor and that on each occasion, Plaintiff failed to do so.[124]

The summary judgment evidence does not raise a fact issue that Herron knowingly and intentionally, or with reckless disregard for the truth, made a false statement in her affidavit about KNM's seizure disorder.  McCoy and his mother both told Herron that the KNM had a seizure disorder, and Plaintiff admitted that KNM had had a seizure several weeks earlier.  Simply because Plaintiff disagrees with others' characterization of her son's medical history does not raise a fact issue that Herron lied in her affidavit when telling the court that family members told her that KNM had a seizure disorder.  Additionally, Herron produced sufficient evidence to support her assertion of medical neglect, and Plaintiff failed to produce any contradictory evidence.

### 3.  Unrestrained Infant

Herron's affidavit recounted that TDFPS received a second

---

[121]    See id.

[122]    See id.

[123]    See id.

[124]    See id. pp. 20-21.

referral concerning Plaintiff's children on November 27, 2014, specifically, that Plaintiff got into a verbal altercation with KS's father and then drove away in the father's vehicle with KS on her lap, "not buckled up."[125]  The summary judgment evidence shows that the basis for this information was a Houston Police Department Report.[126]  That report stated, "[Plaintiff] got into [KS's father's] truck and drove off holding [KS] on her lap not buckled up.  [KS's father] jumped onto the door as [Plaintiff] was driving off."[127]

On December 9, 2014, during the home visit with Herron, Plaintiff attempted to explain the altercation between herself and KS's father.[128]  According to Herron's investigative notes, Plaintiff admitted holding KS on her lap as she was driving the car and did not think it was wrong to do so.[129]  Herron also attempted to contact KS's father about the incident without success.[130]

Plaintiff argues that KS was actually restrained in the back seat of the vehicle during the altercation but failed to support this averment with an affidavit.  This version of the incident was

---

[125]    Doc. 107-1, Ex. A to Def.'s Mot. for Summ. J., Aff. of Herron p. 3.

[126]    See Doc. 107-3, Ex. C to Def.'s Mot. for Summ. J., Investigative Report p. 3.

[127]    Id.

[128]    See id.

[129]    See id.

[130]    See id. p. 20.

the substance of her testimony at the post-removal hearing, but as the court has granted Plaintiff's motion in limine, it will not consider the hearing testimony in any way.

Looking solely at the facts as known by Herron at the time of the making of her affidavit, there was no evidence that KS was in a car seat during the incident.  Herron's own notes reflect that Plaintiff admitted that she held KS on her lap as she drove off, and KS's father would not return Herron's calls.  Even if the court were to assume that Herron lied in her field notes and the lie was repeated in Herron's affidavit, the false statement was not material to the court's determination of probable cause as there is evidence in the record supporting the removal of the children based on medical neglect.[131]

### V.   Conclusion

In conclusion, it was incumbent on Plaintiff to raise a fact issue that Herron knowingly made false statements in her affidavit. This she has failed to do.   It is therefore **RECOMMENDED** that Defendant's Motion for Summary Judgment be **GRANTED**.  It is further **ORDERED** that Plaintiff's Motion In Limine is **GRANTED**.

The  Clerk  shall  send  copies  of  this  Memorandum  and

---

[131]   The judge heard Plaintiff testify that KS was in his car seat during the incident and KS's father's testimony that the child was unrestrained in the back seat and nonetheless sustained the removal of the children from Plaintiff's custody. This court can only assume that either the state court did not credit Plaintiff's testimony or that the court credited Plaintiff's testimony but found other evidence supporting removal of the children.  Either way, the disputed testimony must be deemed non-material.

Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 3rd day of September, 2019.

Nancy K. Johnson
United States Magistrate Judge

29